Upon review of the competent evidence of record, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff-employee.
3. PPG Industries, Inc. was a self-insured employer.
In addition, the parties stipulated into evidence the following:
1. Form 22 Statement of Days Worked and Earnings of Injured Employee dated 9 February 1999.
2. Three pages of medical reports.
A packet containing eighty pages of medical records and reports was subsequently received into evidence.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. In April 1994, plaintiff began working for defendant, a company which manufactured a type of fiberglass yarn. During most of his employment there, plaintiff worked as a twist machine operator (TMO).
2. Plaintiffs job consisted of three primary tasks. First, plaintiff doffed his machine, which involved removing bobbins weighing between two and thirtyfive pounds from the frame and placing them on a pin truck. The frame could have as many as eighty bobbins, forty on each side. However, doffing was not required on most days. Plaintiffs second task was cleaning, which he did about twelve times per shift. There were three different levels of cleaning that plaintiff would do during each shift. Plaintiff used long brushes to clean the inside of the frame, and he also used steel wool and chemical towels to clean other parts.
3. The third task was called the wrapin procedure. Large spools of fiberglass thread, called packages, were located in two positions, which were 6 ½ and 7 feet high on the machine, with forty spools at each level. Plaintiff needed a certain length of thread hanging from a package in order to thread it through the machine and attach it to a bobbin. The machines were supposed to release the appropriate amount of thread automatically. However, in July 1997, the machines began to malfunction so that plaintiff often had to reach up and turn each bobbin six or seven times in order to release the thread. There was resistance against the motion so plaintiff had to exert some effort to turn the packages. At 5 feet 6 ½ inches tall, plaintiff had to stand on his toes and reach over his head to grasp the higher packages and sometimes he stood on the machine.
4. Once the frame was fully threaded, plaintiff would monitor the machine to be sure that all of the spindles were running. He might also sweep around the machine while it was operating.
5. Plaintiff also was a weight lifter and engaged in that activity from approximately 1991 until early 1998. He thereafter continued lifting weights at a reduced amount and stopped the inclined overhead lift.
6. In November 1997, plaintiff noticed a burning pain in his left shoulder when he turned the packages at work and during the night. Occasionally, plaintiff was awakened by numbness in his left arm. In late January 1998, plaintiff saw a physicians assistant at his doctors office with complaints of shoulder pain. The physicians assistant noted that plaintiff complained of increased pain when lifting weights with improvement when he avoided lifting weights. Consequently, plaintiff was advised not to lift weights for ten days and to take antiinflammatory medication. On 10 February 1998, plaintiff saw Dr. Worf and reported that he was continuing to have some pain in his shoulder and that the medicine bothered his stomach. Dr. Worf changed plaintiffs medication at that time.
7. On 25 February 1998, as he was turning one of the packages at work, plaintiff experienced a sharp pain in his left shoulder. Plaintiff was treated by the company nurse who applied heat and ice to his shoulder. On 5 March 1998, plaintiff saw Dr. Christakos and reported shoulder problems associated both with overhead activity at work and with weight lifting. Plaintiff had continued to lift weights but had reduced the amount that he lifted. Dr. Christakos was of the impression that plaintiff had left shoulder impingement syndrome and prescribed medication and exercises. Plaintiffs symptoms persisted with only slight improvement. Consequently, on 24 March 1998, Dr. Christakos injected plaintiffs shoulder with a steroid solution and referred him for physical therapy. No further notes were provided from Dr. Christakos, but plaintiff apparently continued to see him and the company doctor during the next six months. Despite his symptoms, plaintiff was able to continue working throughout that time at light duty.
8. Dr. Christakos then referred plaintiff to Dr. Holthusen, an orthopedic surgeon. Dr. Holthusen examined plaintiff on 28 October 1998. Plaintiff advised Dr. Holthusen that he had had left shoulder pain for over a year. Plaintiff reported that his shoulder had been treated with a cortisone injection and with physical therapy, but the pain was persistent. Plaintiff described repeated overhead lifting at work and weight lifting activities, some of which aggravated his symptoms. Dr. Holthusen was of the impression that plaintiff had rotator cuff tendinitis secondary to subacromial impingement. Dr. Holthusen treated plaintiff with an injection to the subacromial space and continued work restrictions for two weeks. On 3 February 1999, plaintiff returned to Dr. Holthusen and reported that when he returned to work in the TMO position he developed increased symptoms associated with repeated overhead reaching. Dr.Holthusen advised plaintiff to keep everything below shoulder level so that he would not cause impingement at the shoulder.
9. Dr. Holthusen also saw plaintiff in April 1999, but that office note was not provided.
10. On 25 February 1998, plaintiff was performing his normal job duties when he experienced sharp pain while reaching up to turn a package. There was nothing unusual or out of the ordinary in the manner that plaintiff turned the package, nor was there an interruption of plaintiffs regular work routine.
11. Plaintiff did not sustain an injury by accident arising out of in the course of his employment on 25 February 1998.
12. However, plaintiff was placed at an increased risk of developing rotator cuff tendinitis or impingement syndrome by reason of the repetitive overhead reaching required by his job as a twist machine operator as compared to the general public not so employed. Although plaintiffs weight lifting activities were an equal factor, the overhead job activities he performed were a significant contributing factor in the development of his left shoulder condition.
13. Plaintiffs rotator cuff tendinitis was an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant-employer and which was not an ordinary disease of life to which the general public was equally exposed.
14. As of the date of hearing before the Deputy Commissioner, plaintiff had not lost any wages as a result of his left rotator cuff tendinitis because his employer had paid him his regular earnings during the time that he worked at light-duty. However, plaintiff was unable to perform his regular job as a twist machine operator from approximately March 1998 until December 1998.
15. Plaintiff required medical treatment for his left shoulder condition which tended to effect a cure, give relief, and lessen his period of disability. Plaintiff had not reached maximum medical improvement as of the date of hearing before the Deputy Commissioner. Consequently, no finding is made regarding whether plaintiff sustained any permanent partial disability as a result of his left shoulder condition.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On 25 February 1995, plaintiff did not sustain an injury by accident arising out of and in the course of his employment with defendant-employer. G.S. 97-2(6).
2. Plaintiffs left rotator cuff tendinitis developed due to causes and conditions which are characteristic of and peculiar to his employment with defendant-employer, but excluding all ordinary diseases of life to which the general public is not so employed. G.S. 97-53(13); Booker v.Duke Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
3. Plaintiffs employment with defendant-employer placed him at an increased risk of developing left rotator cuff tendinitis as compared to members of the general public not so employed. Rutledge v. Tultex Corp.,308 N.C. 85, 301 S.E.2d 359 (1983).
4. Plaintiff did not lose any wages as a result of his occupational disease. Therefore, plaintiff is not entitled for compensation for temporary total disability. G.S. 97-28; 97-29.
5. Plaintiff is entitled to have defendant pay for all medical expenses incurred or to be incurred by plaintiff as a result of his left rotator cuff tendinitis. G.S. 97-59.
6. Defendant was not denied due process by virtue of the fact that the Deputy Commissioner submitted questions to plaintiffs treating physician for his responses during the deposition.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiffs claim for left rotator cuff tendinitis is allowed.
2. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff as a result of his left rotator cuff tendinitis.
3. Defendant shall pay the costs.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER